## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

EDWARD GAYDOS,
　　　　Plaintiff,

　　v.

SIKORSKY AIRCRAFT, INC.,
　　　Defendant.

No. 14-cv-636 (VAB)

## RULING ON MOTION FOR SUMMARY JUDGMENT

　　Plaintiff, Edward Gaydos, brought this action against his former employer, Sikorsky Aircraft, Inc. ("Sikorsky" or "Defendant"), raising claims under the Family Medical Leave Act (the "FMLA").  Mr. Gaydos's Complaint alleges violations of the FMLA in two ways: (1) that Defendant retaliated against him for exercising his FMLA rights by transferring him to a non-supervisory position, treating him adversely and differently from other similarly situated employees, and by terminating his employment and (2) that Defendant interfered with his exercise of his FMLA rights by using his FMLA leave as a negative factor in the decision to terminate his employment.  ECF No. 11.  Defendant has moved for summary judgment on all of Plaintiff's claims.  ECF No. 38.

　　For the reasons laid out below, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART.**  The Court fails to find a viable FMLA retaliation claim with respect to two of Mr. Gaydos' three theories of recovery: (1) that Sikorksy retaliated against him for exercising his FMLA rights by transferring him to a non-supervisory position or (2) by treating him adversely and differently from other similarly situated employees with respect to performance evaluations or the awarding of bonuses or in any other way short of termination.

1

The Court therefore, grants summary judgment on these two theories.  The Court, however, finds that a genuine issue of material fact exists as to whether Roberto Rodriguez's ostensibly neutral assessment of Mr. Gaydos during the company-wide Reduction in Force ("RIF") that led to Mr. Gaydos's termination was pretext for retaliating against him for his use of FMLA leave.  On this basis, the Court also finds a genuine issue of material fact as to whether Sikorsky interfered with Mr. Gaydos's FMLA rights by using his leave as a negative factor in his termination.

I.      STATEMENT OF FACTS

    Sikorsky designs and manufactures helicopters for commercial, industrial, and military use, supplying helicopters to the United States Armed Forces and other customers throughout the world.  Def.'s Local Rule 56(a)(1) Statement ¶¶ 1-2, ECF No. 40.  Sikorsky has policies requiring adherence to the FMLA.  Id. ¶ 3.  Sikorsky's parent company, United Technologies Corporation, also has a FMLA policy that identifies the circumstances under which employees may take family leave, including intermittent or reduced schedule leave, and provides that employees will not be discriminated against for exercising their rights under that policy.  Id. ¶¶ 5-6.

    Mr. Gaydos worked at Sikorsky as a salaried supervisor in the Blades department on the second shift, beginning on or about August 2008 until his termination on February 27, 2014.  Def.'s Local Rule 56(a)(1) Statement ¶ 7, ECF No. 40.  He was a L6 supervisor throughout his employment.  Gaydos Dep. 25:21-25, ECF No. 49-4. Mr. Gaydos typically supervised anywhere from roughly 13 to 21 hourly employees working in the production of the Hawk Tail Cell tail blades for Blackhawk and Naval Hawk helicopters, the TI or Titanium Line where spars for main blades were made, or the GFN cutting room, where composite material for commercial tail blades was cut.  Id. at 25:8-28:12, 35:1-10.

From August 2008 through 2013, Mr. Gaydos worked at Sikorsky's Stratford facility, where his immediate supervisor was Gary Byrd. Def.'s Local Rule 56(a)(1) Statement ¶ 9. Mr. Byrd's manager was Roberto Rodriguez. *Id.* ¶ 10. In 2013, Mr. Byrd and Mr. Rodriguez transferred Mr. Gaydos to Sikorsky's Bridgeport facility, *id.* ¶ 9; Byrd Dep. 11:5-14, ECF No. 39-4, because the primary second shift supervisor in Bridgeport, Frank Inzitari, required assistance. Byrd Dep. 12:3-8, 19:10-12, ECF No. 39-4. Mr. Gaydos had no issue with this transfer and his salary and shift remained the same. Gaydos Dep. 37:18-24, ECF No. 49-4.

Mr. Gaydos worked at Sikorsky from Mondays through Fridays, with some weekend work roughly every third or fourth weekend. Gaydos Dep. 58:15-18, ECF No. 39-3. Weekend work was often required of supervisors, and Mr. Gaydos and his fellow supervisors typically took turns and decided who should work each weekend amongst themselves. *Id.* at 58:21-25. Supervisors generally knew the schedule months in advance so that they could plan around the weekends when they would be required to work. *Id.* at 58:25-59:4. At Sikorsky, there was an expectation that supervisors would stay at work as long as necessary, which applied equally to all supervisors. *Id.* at 67:24-68:3.

On or around October 2011, Mr. Gaydos requested FMLA leave to care for his parents, which Sikorsky approved. Def.'s Local Rule 56(a)(1) Statement ¶¶ 14-15, ECF No. 40. Mr. Gaydos's father had Parkinson's disease and his mother had Alzheimer's disease. Amended Compl. ¶¶ 11-12, ECF. No. 11; Gaydos Dep. 24:1-2, ECF No. 49-4. Mr. Gaydos cared for both of his parents until his father passed away in December 2012, and continues to care for his mother, as of the date this lawsuit was filed. Amended Compl. ¶¶ 14-15, ECF. No. 11. Mr. Gaydos received 80 days or 640 hours of FMLA leave each year, which he took intermittently for an average of two days per week. Def.'s Local Rule 56(a)(1) Statement ¶¶ 17-18. Mr.

Gaydos generally took off every Tuesday or Wednesday and then every Friday as part of his FMLA leave.  Byrd Dep. 107:17-18, ECF. No. 39-4; Gaydos Dep. 59:13-16, ECF. No. 39-3.  His leave was typically unpaid, except for up to ten days every other year or so, when he was able to transfer unused sick days into paid FMLA leave days.  Gaydos Dep. 103:12-22, ECF No. 49-4.  After 2011, Mr. Gaydos reapplied for FMLA leave each year, which Sikorsky also approved.  Def.'s Local Rule 56(a)(1) Statement ¶ 16, ECF No. 40.  Mr. Byrd and Mr. Rodriguez were both aware of Mr. Gaydos's intermittent FMLA leave. Rodriguez Dep. 126:8-15, ECF. No. 39-5.  No other supervisors in Mr. Rodriguez's chain of command were taking FMLA leave.  Rodriguez Dep 106:13-18, ECF No. 49-7; Gitto Dep. 29:4-5, ECF No. 49-6.

When Mr. Gaydos took his FMLA leave, Mr. Byrd requested that he coordinate with his fellow supervisors to find coverage, which Mr. Gaydos did "very well."  Byrd Dep. 107: 16-22, ECF. No. 39-4.  No one complained about needing to cover for him during his FMLA absences.  Rodriguez Dep. 127: 8-10, ECF. No. 39-5.  Indeed, needing to find coverage when a supervisor was absent on any given day was fairly routine.  Byrd Dep. 104:10-14, ECF. No. 39-4.

### A.      Plaintiff's FMLA Problems

Mr. Gaydos has testified that Mr. Byrd and Mr. Rodriguez were critical of his FMLA leave.  Gaydos Dep. 65:8-17, ECF. No. 39-3.  According to him, no other managerial employees were critical of his FMLA absences. *Id.* at 65:18-19.

Mr. Gaydos testified that there was an incident in early January 2012, when Mr. Byrd told him that his use of FMLA leave was unacceptable.  Gaydos Dep. 70:18-71:1, ECF No. 39-3.  Mr. Byrd first asked him how his parents were doing and, upon hearing his reply, Mr. Byrd asked him "how long is this going to be going on?"  *Id.* at 71:8-18.  When Mr. Gaydos stated that, "in all honesty," he didn't know, Mr. Byrd made several comments to the effect of "this is

4

unacceptable, you need to get some help, we can't do business like this," and "we have to come up with a plan." *Id.* at 71:8-18.  Mr. Gaydos did not respond, and there was no follow-up conversation regarding this topic.  *Id.* at 72:12-17.  Later that day, Mr. Gaydos described this conversation to several of his fellow supervisors.  *Id.* at 72:18-73:16.

In February or March of 2012, Mr. Rodriguez and Mr. Gaydos had a conversation where Mr. Rodriguez recommended a caregiver to him as a "solution,"  "aggressively promoting" the idea by continuing to insist, in the course of a single conversation, that the caregiver would be a good candidate to care for his parents.  Gaydos Dep. 75:4-25, ECF No. 49-4.  Mr. Gaydos responded that, with his mother's condition, she was uncomfortable with and often became agitated when around strangers, which made hiring an outside caregiver unsuitable.  *Id.* at 75:8-14.  Mr. Rodriguez did not bring up the topic of hiring a caregiver again.  *Id.* 75:20-21.

Mr. Gaydos testified that Mr. Byrd generally had an "attitude" towards his FMLA leave, and that when he informed Mr. Byrd of specific dates when he was taking leave, Mr. Byrd "would be very quiet."  Gaydos Dep. 66:1-5, ECF. No. 39-3.  Mr. Gaydos also testified that Mr. Byrd typically met his requests for family leave with "silence" and "kind of an irritated demeanor."  Gaydos Dep. 74:22-25, ECF No. 49-4.  In one particular instance, around the spring of 2013, Mr. Byrd asked Mr. Gaydos if he could stay beyond his scheduled work hours, and when he stated that he could not, Mr. Byrd "became very belligerent" and asked "well, if you don't stay, who's gonna?"  Gaydos Dep. 66:20-67:2, ECF. No. 39-3.  Mr. Gaydos told Mr. Byrd, "I'm sorry Gary, I don't have the coverage," and Mr. Byrd responded by "mumbl[ing] and storming off."  *Id.* at 67:2-5.  Mr. Gaydos also testified that, in the latter part of 2013, Mr. Rodriguez once asked him to stay past the end of his scheduled shift and when he stated that he could not, Mr. Rodriguez "stopped in his tracks, seemed to compose himself, and then shook his

head and walked off" without saying anything.  *Id.* at 68:21-69:10.  Mr. Gaydos testified that Mr.

Rodriguez would have known that he could not stay past the end of his shift because of his

history of using FMLA leave.  *Id.* at 69:13-20.  Mr. Gaydos did not inform or complain to

anyone else at Sikorsky about either of these incidents.  *Id.* at 70:10-13.

      During his employment at Sikorsky, Mr. Gaydos encountered another problem with his

FMLA leave. Gaydos Dep. 98:10-15, ECF No. 39-3.  In 2013, during a meeting on the Friday

before Memorial Day between Mr. Rodriguez, Mr. Gaydos, and the other supervisors, Mr.

Gaydos volunteered to work through the weekend and on Memorial Day.  Gaydos Dep. 99:25-

100:15, ECF No. 39-3.  At Sikorsky, there was a standard practice that, if a supervisor worked on

a paid holiday, such as Memorial Day, and was not paid, he or she would receive a "comp day"

off at some other time.  *Id.* at 100:15-22.  On the following Monday, June 3, Mr. Gaydos sent an

email to Mr. Byrd explaining that he needed to use and return a borrowed log splitter and

requesting Wednesday, June 5, as his comp day for working on Memorial Day in order to do so.

Def.'s Ex. 9, ECF No. 39-9.  Mr. Byrd replied that he would "need to look into" whether Mr.

Gaydos could use his comp day because he was "technically" only working a three-day week

due to his intermittent FMLA leave.  *Id.*  Mr. Gaydos ultimately received the June 5 comp day

that he requested.  Def.'s Ex. 10, ECF No. 39-10.

      **B.**    **Plaintiff's Move to ACE Coordinator Position**

      In 2012, Mr. Gaydos met with Mike Gitto, the Human Resources manager for the Blades

Department, and had a discussion about his rights under the FMLA and "prevent[ing] anything

from happening" as a result of his taking FMLA leave.  Gitto Dep. 22:17-21, ECF No. 49-6.  Mr.

Gitto did not see that discussion with Mr. Gaydos as a formal complaint requiring investigation,

though he did follow up with Mr. Gaydos's management to discuss his FMLA-related concerns.

*Id.* at 22:17-21. Mr. Gitto had a meeting with Mr. Byrd and Mr. Rodriguez, during which Mr.

Byrd told Mr. Gitto that, while Mr. Gaydos was "competent" at his job, there was a "business

impact" from his FMLA leave because "he would miss certain important communications while

he was out that did have an impact on him when he was at work." *Id.* at 23:19-24:4.  Mr.

Rodriguez "deferred to Mr. Byrd's opinion regarding this point. *Id.* at 24:5-8, ECF No. 49-6.

Mr. Gitto cautioned Mr. Byrd that Mr. Gaydos could not be penalized in assessments of his job

performance with regards to negative business impact caused by his FMLA leave. *Id.* at 24:9-15.

Mr. Byrd seemed to understand this advice, though he appeared to feel some "frustration"

regarding it. *Id.* at 24:19-21.

In June 2012, Mr. Byrd and Mr. Rodriguez moved Mr. Gaydos from his position as

Blades supervisor into an ACE coordinator position. Def.'s Local Rule 56(a)(1) Statement ¶ 24,

ECF. No. 40.  ACE, or Achieving Competitive Excellence, is a proprietary operating system that

Sikorsky uses to ensure quality in its products and processes, and it is based on a commitment to

continuously improve the value offered to Sikorsky customers and investors. *Id.*  ¶¶ 25-26.

ACE was an important initiative at Sikorsky and all supervisors working under Mr. Rodriguez

were expected to be "ACE oriented."  Rodriguez Dep. 102:8-11, ECF. No. 39-5.

Mr. Rodriguez and Mr. Byrd's motives in moving Mr. Gaydos to this position are highly

disputed.  Pl.'s Rule 56(a)(2) Statement, Disputed Issues of Material Fact ¶¶ 8-18, ECF No. 49-2.

At some point before Mr. Gaydos was moved to the ACE coordinator position, but after the

previous meeting between Mr. Byrd, Mr. Rodriguez, and Mr. Gitto, Mr. Byrd and Mr. Rodriguez

requested a second meeting with Mr. Gitto.  Gitto Dep. 32:1-9, ECF No. 49-6.  During this

meeting, Mr. Byrd wanted Mr. Gitto's advice on how to transition Mr. Gaydos to the ACE

coordinator role, as a "mutually acceptable solution."  *Id.* at 32:22-33:2.  Mr. Byrd believed this

role would be better for Mr. Gaydos because it was more project-based, unlike a supervisors'
role, which benefitted from a supervisor's "continuity in [his or her] business schedule" to have
"better knowledge of where blades were in the production process." *Id.* at 34:1-10. Mr. Gitto
expressed concern regarding a "compensation issue" because Mr. Gaydos was a supervisor
eligible for certain bonuses that were only paid out to "supervisors of hourly employees." *Id.* at
33:12-19. Mr. Gitto recommended that they not transfer Mr. Gaydos because the compensation
issue meant that the ACE coordinator position was not "substantially equivalent" to the
supervisor role. *Id.* at 35:19-24, 36:15-20.

     To prepare for becoming the second-shift ACE coordinator, Mr. Gaydos temporarily
switched to the first shift to receive training from a manager, Julio Rodriguez (no relation to
Roberto Rodriguez). Gaydos Dep. 78:10-79:13, 82:13-15, ECF. No. 49-4. While switched to
the first shift for training, Mr. Gaydos still took intermittent FMLA leave as needed. *Id.* at
85:20-22. During this training period, Mr. Gaydos found that J. Rodriguez was often in meetings
and rarely available to provide training or guidance regarding the ACE coordinator position. *Id.*
at 84:16-85:4. Mr. Gaydos was also concerned that the ACE position required "advanced
computer and analytic skills," which he had little experience with, and when combined with the
lack of training, made him feel that he "was literally thrown into the deep end of the pool and
expected to swim." *Id.* at 85:23-86:9. Within a week of starting this training period, Mr. Gaydos
approached Mr. Rodriguez to express concern about not being able to do the ACE job without
proper training. *Id.* at 86:21-87:8. Mr. Rodriguez's responded by telling him to "just learn it"
and dropping off a number of ACE manuals on his desk. *Id.* at 87:19-25.

     Within two weeks of starting this training period, Mr. Gaydos approached Mr. Gitto
again in order to express his concerns about the ACE coordinator transition. Gaydos Dep. 88:19-

25, 89:1-4, ECF No. 49-4; Gitto Dep. 42:11-19, ECF No. 49-6.  In his conversation with Mr. Gitto, Mr. Gaydos stated that he was afraid he had been moved to the ACE coordinator position as a way of forcing him out because of his use of FMLA leave.  Gaydos Dep. 90:1-5, ECF No. 49-4.  Mr. Gitto then met with Mr. Byrd and Mr. Rodriguez and reiterated his advice from his second meeting with them, that if Mr. Gaydos did not have any hourly associates reporting to him, he would not be eligible for the supervisory merit plan and supervisor bonuses.  Byrd Dep. 64:2-14, ECF. No. 39-4; Gitto Dep. 42:20-22, 48:9-12, ECF No. 49-6. Shortly after this third meeting with Mr. Gitto, Mr. Byrd and Rodriguez placed two or three employees under Mr. Gaydos's supervision.  Byrd Dep. 65:24-66:4, ECF No. 39-4.

In total, there was only a roughly two week period where Mr. Gaydos did not have any employees to supervise, and as long as there were employees under his supervision, his eligibility for supervisor bonuses was restored.  Gaydos Dep, 92:18-93:15, ECF. No. 39-3.  By August of 2012, Mr. Gaydos returned to being a second shift supervisor, his original job.  *Id.* at 94:2-9.  Mr. Gaydos did not lose any bonus money as a result of the temporary transition to the ACE position.  *Id.* at 92:14-24.  He also continued to receive his ten-percent pay differential for being a second-shift employee during the training period he spent on the first shift.  *Id.* at 94:13-22.  Mr. Gaydos did not suffer any financial effect because of his temporary transition to the ACE role.  Gitto Dep. 93:14-17, ECF No. 39-8.   After Mr. Gaydos left the ACE coordinator position, none of the other Sikorsky Blades supervisors was placed into it.  Rodriguez Dep. 232:4-24, ECF No. 39-5.  The ACE coordinator position that Mr. Gaydos was put into no longer exists.  *Id.* at 237:1-6.

    **C.**    **Plaintiff's Job Performance**

Mr. Gaydos's annual gross income for each of the full years that he was employed at Sikorsky are as follows: $71,397.38 (2009), $75,013.82 (2010), $75,587.82 (2011), $57,215.00 (2012), and $61,169.60 (2013).  Pl.'s Local Rule 56(a)(1) Statement ¶ 113, ECF No. 49-2.  In April 2011, prior to his first requesting FMLA leave, he received a 2.8% salary raise.  Amended Compl. ¶ 34, ECF No. 11.  Other L6 Blades supervisors who were still employed at Sikorsky as of July 1, 2014 received April 2011 raises of 2.3% to 5%.  Def.'s Ex. 13, ECF No. 39-13.  Mr. Gaydos received a 1.5% merit raise in April 2013.  Gaydos Decl. ¶ 15, ECF No. 49-3; Amended Compl. ¶ 33, ECF No. 11.  Other L6 Blades supervisors who were still employed at Sikorsky as of July 1, 2014 received merit raises of 1.9% to 2.3% in April 2013.  Def.'s Ex. 13, ECF No. 39-13.  Of the L6 Blades supervisors who were no longer employed at Sikorsky as of July 2014, only one, Brenda Burks, received a raise lower than 1.9% in April 2013, with a merit raise of 1.5%.  Def.'s Ex. 13, ECF No. 39-13.[1]

Mr. Gaydos received a bonus of $3,000 in April 2011.  Amended Compl. ¶ 33-34, ECF No. 11.  Other supervisors that continued to be employed at Sikorsky as of July 1, 2014 received bonuses of $5,000 to $8,000 in 2011.  Def.'s Ex. 13, ECF No. 39-13.  Only partial information regarding bonuses is available for the supervisors that were no longer employed at Sikorsky as of July 1, 2014, but in 2011, Ms. Burks received a bonus of $2,700 and another received $3,000.  Def.'s Ex. 13, ECF No. 39-13.  Mr. Gaydos's April 2013 bonus was $3,000.  Amended Compl. ¶ 33-34. Sikorsky supervisors that remained employed as of July 1, 2014 received April 2013 bonuses of $4,000 to $5,500.  Def.'s Ex. 13, ECF No. 39-13.  Ms. Burks and another supervisor

---

[1] Although this exhibit does not list merit raise percentages for the employees who were no longer employed at Sikorsky as of July 2014, it is possible to calculate the percentage of the raise that the employees received by comparing the listed pay rates corresponding to the periods immediately before and after April 2013.  Of these employees, Brenda Burks received a raise of 1.5%, John Horoschak received a raise of 2.3%, and Frank Schultz received a raise of 3%.

no longer employed as of July 1, 2014 both received $3,000 bonuses in 2013.  Def.'s Ex. 13, ECF No. 39-13.[2]

Mr. Byrd testifies that he had recurring job performance issues with Mr. Gaydos, namely that he was "very poor at troubleshooting" and problem solving, and that he often brought problems to Mr. Byrd without offering a solution.  Byrd Dep. 36:21-37:9, ECF No. 39-4.  Mr. Byrd also thought that Mr. Gaydos had a problem "regarding his inability to learn processes and associated criteria."  *Id.* at 37:22-38:2.

Mr. Rodriguez also testified that Mr. Gaydos had "difficulty understanding the technicality of process."  Rodriguez Dep. 186:14-17, ECF No. 39-5.  Mr. Rodriguez found that his problems with understanding the technical part of the business contributed to a "communication skill problem" because he had trouble communicating technical process to his peers and subordinates.  *Id.* at 30:4-13. Mr. Rodriguez also thought that Mr. Gaydos did not have "the knowledge and the background to be able to assign his people correctly" and that a first shift supervisor needed to assist him in assigning his direct reports on at least one occasion.  *Id.* at 31:21-32:5.

Mr. Gaydos was rated "fully competent" as his summary rating in his most recent annual performance feedback tool or "PFT" performance review prior to his termination. Gaydos Aff. ¶ 10, ECF No. 49-3.  PFTs are yearly performance reviews that are geared towards opportunities for employee improvement.  Rodriguez Dep. 25:15-24, ECF No. 49-6.  On the PFT summary rating scale, there are four ratings.  Def.'s Ex. 15 at 7-8, ECF No. 39-15.  From lowest to highest,

---

[2] Because the list of raises and bonuses for L6 Blades supervisors that Sikorsky provided does not include Mr. Gaydos and because he also did not provide information regarding his raises or bonuses outside of 2013 and 2011, the record before the Court does provide allow a full comparison between his bonuses and raises before and after he began taking FMLA leave or a full comparison of his compensation and raises with those of other Sikorsky supervisors who did not take FMLA leave.

the ratings are "U – Unsatisfactory Performance/Improvement Required," "P – Progressing," "FC – Fully Competent Performance," and "EP – Exceptional Performance.  Def.'s Ex. 15 at 7-8, ECF No. 39-15.

The record only includes Mr. Gaydos's PFTs for the years 2010, 2011, and 2012.  In those years, Mr. Gaydos has been ranked both progressing and fully competent.  For 2010, Mr. Gaydos was rated "FC - Fully Competent.  Pl.'s Ex. 9 at 6-7, ECF No. 49-11.  In 2011, the year when he began taking intermittent FMLA leave in October, his performance rating deteriorated, and he was rated "P – Progressing."  Def.'s Ex. 14 at 8, ECF No. 39-14.  Mr. Gaydos was once again rated "FC - Fully Competent" in 2012.  Def.'s Ex. 15 at 7, ECF No. 39-15.

In Mr. Gaydos's 2010 performance review, for a period before he started taking FMLA leave, Mr. Byrd wrote that he had weaknesses in the competency areas of analytical thinking and focus on results.  Pl.'s Ex. 9 at 5-6, ECF No. 49-11.  Mr. Gaydos received rankings of "3 – Fully – Competency Fully Evident" for "Analytical Thinking" and "2 – Some – Competency Somewhat Evident" for "Focus on Results."  *Id.*  Under the "Focus on Results category, Mr. Byrd commented that Mr. Gaydos needed to "execute with a greater sense of urgency."  *Id.*  In Mr. Gaydos's summary rating for the year, Mr. Byrd noted that he needed to "enhance his understanding of delivery & cost targets" and demonstrate "more engagement with driving product flow and meeting daily commitments," as well as "hold employees accountable for workmanship issues" to help improve performance and hourly output to "help reach expected goals."  *Id.* at 7.

For 2011, Mr. Gaydos's performance review again noted weaknesses in the competency areas of "Analytical Thinking" and "Focus on Results," with ratings of "2 – Some – Competency Somewhat Evident" for each of those categories.  Def.'s Ex. 14 at 7, ECF No.  39-14. As to

"Analytical Thinking," Mr. Byrd and Mr. Rodriguez noted that Mr. Gaydos "fell short on taking

the lead to identify and correct ["Cost of Poor Quality" or] COPQ and transfer cost issues that

impacted the Hawk Tail cell." *Id.* at 7.  His review stated that "[p]oor COPQ performance needs

to be reversed" in 2012 and that this was a focus area for Mr. Gaydos. *Id.* at 6.  With regards to

"Focus on Results," Mr. Byrd and Mr. Rodriguez wrote that "as a front-line supervisor," Mr.

Gaydos "struggled" throughout the year with "meeting daily output goals and overcoming COPQ

issues in the Hawk Tail Cell" and that improvement was needed. *Id.* at 7.

For 2012, Mr. Gaydos was rated "2 – Some – Competency Somewhat Evident" for

"Analytical Thinking" and "3 – Fully – Competency Fully Evident" for "Focus on Results."

Def.'s Ex. 15 at 5-7, ECF No. 39-15.  Mr. Byrd noted that Mr. Gaydos is "expected to be more

engaged to bring about change in his areas of responsibility" and that this area "must be

improved" in 2013. *Id.* at 8.  Mr. Byrd also wrote that Mr. Gaydos needed "to invest the time &

energy to better understand manufacturing processes & associated criteria" and "engage himself

in using the tools of ACE to support problem elimination" including COPQ, output, and costs

and that he needed "to hold employees accountable for workmanship and recurring defects

impacting COPQ," more engagement with ACE tools to overcome COPQ and costs issues, as

well as "better understand product transfer cost targets and implement plans to meet those

target[s]." *Id.* at 8.

### D.    Plaintiff's Termination

In February 2014, Sikorsky underwent a large-scale reduction in force ("RIF").  Def.'s

Br. 1, ECF No. 39; Def.'s Local Rule 56(a)(1) Statement ¶ 68, ECF No. 40.  Mr. Rodriguez

testified that Sikorsky conducted the RIF because of economic conditions, as Sikorsky had lost

contract revenue and customer demand and commercial business were going down.  Rodriguez
Dep. 185:10-23, ECF No. 39-5; Def.'s Rule 56(1)(1) Statement ¶¶ 68-69, ECF No. 40.

The objectives of the Sikorsky RIF were to "respond to economic issues," "realign
business and address structural issues," and "retain [the] best talent." Def's Ex. 11 at 2, ECF No.
39-11.  The RIF process is designed to be "prospective looking" and focus on assessing
employees' ability to perform under current and future business conditions rather than relying on
retrospective evaluations of an employee, which are geared towards employee development or
distribution of compensation.  *Id.* at 5; Gitto Dep. 65:16-24, ECF No. 39-8.  In a RIF, the
"position is selected for elimination, not [an] individual person," based on a "prospective,
forward-looking view of the organization and whether or not that individual fits into the future
state." Gitto Dep. 65:19-24.  It was possible that an employee rated "fully competent" in recent
performance reviews could still be selected for termination during a RIF.  *Id.* at 65:22-66:1. Mr.
Gaydos was one of approximately 250 salaried Sikorsky employees who were terminated during
the February 2014 RIF.  Walling Decl. ¶ 8-10, ECF No. 39-1.  Mr. Byrd, Mr. Gaydos's direct
supervisor when he worked at the Stratford facility, was also among the employees that were
terminated.  Byrd Dep. 5:20-23, ECF No. 39-4.

To prepare for the RIF, managers rate and rank each salaried employee on an
Employment Assessment Matrix.  Walling Decl. ¶ 7, ECF No. 39-1.  Managers are given a
spreadsheet with lists of employees in their chain of command to evaluate.  Rodriguez Dep.
150:4-12, ECF No. 39-5.  Prior to making these rankings, managers received online training
regarding the RIF process and how to conduct the assessment.  *Id.* at 155:7-17.  Employees were
assessed on the following five criteria, with a numerical score assigned for each: "achieves
results (1-10)," "criticality of skills (1-10)," "qualifications (1-5)," "business orientation (1-5),"

and "interpersonal skills (1-5)."  Def's Ex. 11 at 7-8, ECF No. 39-11.  Larger number scores were better for each category. Rodriguez Dep. 167:11-17, ECF No. 39-5.  There were multiple tiers of review, and higher-level managers reviewed the rankings given by lower-level assessors. Def's Ex. 11 at 6, ECF No. 39-11.

Mr. Rodriguez performed assessments for all of the supervisors that worked under him, including Mr. Gaydos.  Rodriguez Dep. 153:5-12, ECF No. 39-5.  Mr. Rodriguez's assessments were based on his personal knowledge of the different employees.  *Id.* at 157: 9-16.  He testifies that, when giving ratings, he used his knowledge of each employee from 2013 and prior years. Rodriguez Dep. 188:12-23, ECF No. 49-6.  Prior to making the assessments, Mr. Rodriguez completed online training for the RIF and discussed the assessment criteria with his general manager, Alan Walling.  Rodriguez Dep. 155:17-23, ECF No. 39-5. Mr. Rodriguez's assessments were reviewed by Mr. Walling before being moved to the next tier, for review by John Palumbo, the Vice President of Product Centers.  *Id.* at 165:15-25.  Mr. Byrd was not involved in Mr. Gaydos's selection for the RIF, and Mr. Byrd did not perform any assessment of him for the RIF.  Byrd Dep. 97:18-23, ECF No. 39-4.

Of the L6 Blades supervisors that Mr. Rodriguez assessed, Mr. Gaydos and Ms. Burks received the lowest scores, with nine points each.  Def.'s Ex. 12, ECF No. 39-12.  The other L6 Blades supervisors that Mr. Rodriguez assessed all received 20 to 25 points each.  *Id.*  Mr. Gaydos received the following scores across the five categories: achieves results (1 out of 10), criticality of skills (2 out of 10), qualifications (2 out of 5), business orientation (2 out of 5), and interpersonal skills (2 out of 5).  *Id.*  Both Mr. Gaydos and Ms. Burks were selected for termination during the RIF.  *Id.*

Following Mr. Gaydos's termination, Sikorsky has not hired anyone to replace him. Rodriguez Dep. 226:15-22, ECF No. 39-5.   Instead, one of the other supervisors who was not terminated, Mr. Inzitari, assumed his duties and responsibilities.  *Id.* at 226:19-227:1.

## II.  STANDARD OF REVIEW

The Court will grant a motion for summary judgment if it determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine dispute of material fact exists.  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamic Co.*, 158 F.3d 622, 626 (2d Cir. 1998)). The substantive law governing the case identifies which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Boubolis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On summary judgment, the court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  When reviewing the record on a motion for summary judgment, the Court must "assess the record in the light most favorable to the non-movant" and "draw all reasonable inferences in its favor."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted).  Furthermore, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case, where . . . the merits turn on a dispute as to the

employer's intent" because direct evidence of discriminatory intent is only rarely available and the record must be "scrutinized for circumstantial proof which, if believed, would show discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Gallo*, 22 F.3d at 1224). Inferences drawn in favor of the nonmovant must, however, be supported by evidence, and the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to defeat summary judgment. *Liberty Lobby*, 477 U.S. at 252. "Conclusory allegations, conjecture, and speculation" are insufficient to create genuine issues of material fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal quotation marks omitted).

## III.    DISCUSSION

Plaintiff's Amended Complaint brings claims under two counts. Under Count One, Mr. Gaydos pursues three distinct theories of recovery, alleging that Sikorsky retaliated against Mr. Gaydos for invoking his right to take FMLA leave by (a) transferring him to a non-supervisory position, (b) treating him differently and adversely from other similarly situated employees, and (c) terminating his employment. Under Count Two, Mr. Gaydos alleges that Sikorsky interfered with the exercise of his right to take FMLA leave and be reinstated to his job or an equivalent job afterwards by using his FMLA leave as a negative factor in the decision to terminate his employment. Defendant moves for summary judgment on both counts. For the following reasons, the Court denies summary judgment on both counts, solely with regards to the issue of whether Mr. Rodriguez's assessment of Mr. Gaydos during the RIF was pretext for discriminating against him for his use of FMLA leave. Summary judgment is granted with respect to Plaintiff's other theories of recovery under Count One.

### A.    Count One: Retaliation Claims

FMLA retaliation claims are analyzed under the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Mr. Gaydos must first make out a prima facie case by establishing that, (1) "he exercised rights protected under the FMLA," (2) "he was qualified for his position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). If he makes this showing, the burden shifts to Sikorsky to provide a legitimate, non-retaliatory reason for the adverse employment action. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). If Sikorsky meets this burden, then Mr. Gaydos must demonstrate that the non-retaliatory reason was actually pretext for retaliation in order to survive summary judgment. *Id.* To show that the non-retaliatory reason was pretextual, the plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason" behind the adverse employment action. *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted).

### 1. Plaintiff's Transfer to ACE Coordinator

The parties dispute whether Mr. Gaydos's transfer to the ACE coordinator position was an adverse employment action. "An adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (quoting *Weeks v. New York State (Div. of Parole)*, 274 F.3d 76, 85 (2d Cir. 2001)). Materially adverse changes in the terms and conditions of employment include termination, demotions "evidenced by a decrease in wage or salary," "material loss of benefits," or "significantly diminished material responsibilities." *Id.* (quoting *Fairbrother v. Morrison*, 412

F.3d 39, 56 (2d Cir. 2005)).  To rise to the level of an adverse employment action, an involuntary transfer must have "created a materially significant disadvantage with respect to the terms of [a plaintiff's] employment."  *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004).

While there are factual disputes over whether Mr. Byrd and Mr. Rodriguez intended to remove Mr. Gaydos from his supervisor role when they transferred him to the ACE coordinator position, the transfer was ultimately short-lived. The parties dispute whether the ACE coordinator role was intended to be Mr. Gaydos's new job, such that he would no longer be a supervisor.  Pl.'s Local Rule 56(a)(2) Statement ¶¶ 33-35.  The weight of the evidence supports Mr. Gaydos's argument that Mr. Byrd and Mr. Rodriguez transferred him because of his FMLA leave.  Mr. Gaydos testifies that neither Mr. Byrd nor Mr. Rodriguez ever informed him about plans to restore him to his second shift supervisor position once he completed ACE coordinator training.  Gaydos Aff. ¶ 4, ECF No. 49-3.  It is also undisputed that no other supervisor was placed into the ACE coordinator position once Mr. Gaydos left it and that the position no longer exists.  Rodriguez Dep. 232:4-24, 237:1-6, ECF No. 39-5.  In the second meeting between Mr. Byrd, Mr. Rodriguez, and Mr. Gitto, Mr. Byrd explained that the ACE coordinator position would be better for Mr. Gaydos because supervisors benefitted from "continuity" in their business schedule.  Gitto Dep. 34:1-10, ECF No. 49-6.  Furthermore, Mr. Byrd and Mr. Rodriguez transferred Mr. Gaydos to the ACE coordinator role after Mr. Gitto explicitly advised them not to because it would not be a substantially equivalent position to his prior supervisor role.  *Id.* at 35:21-24.

Mr. Gaydos cannot, however, show that the transfer was an adverse employment action because Mr. Byrd and Mr. Rodriguez quickly placed hourly employees back under his supervision following their third meeting with Mr. Gitto.  Mr. Gaydos ultimately only spent a

two week period where he was not a supervisor.  Gaydos Dep, 92:18-93:15, ECF. No. 39-3.  He also testifies that he did not lose any income or suffer any financial ill effect from the ACE transition.  *Id.* at 94:13-22; Gitto Dep. 93:14-17, ECF No. 39-8. The Court therefore finds that no reasonable jury could find that the transfer to the ACE coordinator position rises to the level of an adverse employment action.  *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (holding that defendant's delay in transferring plaintiff did not rise to the level of an adverse employment action because there was no failure "to pay his salary" or indication "that the delay in any way harmed his career"); *Charles v. Connecticut, Judicial Branch, Court Support Servs. Div.*, 556 F. Supp. 2d 123, 129 (D. Conn. 2008) (holding that defendant's denial of transfer to plaintiff was not an adverse employment action as it did not lead to a "materially significant disadvantage" or result "in a change in responsibilities so significant as to constitute a setback to the plaintiff's career").  Although the new role could have resulted in Mr. Gaydos losing his supervisor responsibilities, Mr. Byrd and Mr. Rodriguez quickly restored his supervisor status and Mr. Gaydos did not lose any income or ultimately, any supervisory responsibilities.  Thus, Mr. Gaydos cannot make out a prima facie case for FMLA retaliation based on his transfer to the ACE coordinator position.

        **2.**       **Different and Adverse Treatment Vis-à-vis Other Employees Prior to His Termination**

Mr. Gaydos also seeks to base his FMLA retaliation claim on the premise that he was treated less favorably than other employees because of his FMLA leave, even before he was terminated.  The record evidence, however, does not create a genuine issue of material fact on this issue, either through a review of Mr. Gaydos' performance reviews and the awarding of bonuses and raises or through his treatment in the workplace by his direct supervisor, Mr. Byrd.

        **a.**       **Plaintiff's Job Performance**

20

Even in 2010, the year before Mr. Gaydos first applied for FMLA leave, his performance reviews or PFTs suggested that his managers had noticed shortcomings with respect to his being insufficiently results-oriented and lacking sufficient technical knowledge.  In 2010, Mr. Gaydos received a low score of two or "some competency somewhat evident" for "achieves results" and a rating of three or "competency fully evident" for "analytical thinking.  Pl.'s Ex. 9 at 6-7, ECF No. 49-11.  The commentary, written by Mr. Byrd, noted that Mr. Gaydos needed to increase his understanding of delivery and cost targets and be more engaged with holding his direct reports accountable for issues with performance and meeting daily or hourly goals.  Pl.'s Ex. 9 at 6-7, ECF No. 49-11.  The 2010 PFT also noted that Mr. Gaydos needed to "take his technical understanding to the next level."  *Id.* at 6.  Thus, even before he began taking FMLA leave, Mr. Gaydos had been criticized for needing to be more results-oriented and lacking some technical knowledge.

Despite some initial deterioration in the scores that Mr. Gaydos received in his PFTs in subsequent years, the record does not support a finding that any decrease in the scores was based on his FMLA leave.  In 2011, the year when Mr. Gaydos began taking leave, he received lower ratings in some categories than in 2010.  His overall summary rating deteriorated from "fully competent" to "progressing" and his analytical thinking rating dropped from a three or "competency fully evident" to a two, "competency somewhat evident."  Def.'s Ex. 14 at 6-7, ECF No. 39-14.  While this deterioration in his scores, which correlated to the start of his taking intermittent FMLA leave, could support an inference of discriminatory motive, Mr. Gaydos received improved ratings in 2012.  The 2012 PFT, covering a period when he was still taking intermittent FMLA leave throughout the year, included an overall summary rating that improved and returned to "fully competent."  His rating for focus on results improved to three or

21

"competency fully evident."  Because Mr. Gaydos's PFT scores eventually improved during the period when he was regularly taking FMLA leave, a reasonable jury could not find that the criticisms contained in the PFTs were discriminatory.

The RIF assessment included categories for achieves results, criticality of skills, qualifications, business orientation, and interpersonal skills.  Mr. Rodriguez's low ratings for Mr. Gaydos in each of these categories were arguably consistent with Mr. Gaydos's performance reviews that are in the record, from periods both before and after he began taking FMLA leave. While Mr. Gaydos disputes any negative assessments of his performance, alleging that his FMLA leave was the motivating factor behind those assessments, "an employee's disagreement with [his] employer's evaluation of [his] performance is insufficient to establish discriminatory intent." *Ricks v. Conde Nast Publications, Inc.*, 6 Fed.Appx. 74, 78 (2d Cir. 2001) (summary order) (finding that defendant's termination of plaintiff for inadequate performance was well supported in the record despite plaintiff's disagreement).  Furthermore, Mr. Gaydos's performance reviews from after he began taking FMLA leave were largely consistent with his reviews from before he took leave.[3]

While Mr. Gaydos also argues that he began receiving negative performance reviews, low raises, and low bonuses only after he started taking FMLA leave, the record does not support these claims.  As discussed above, Mr. Gaydos's PFT performance reviews make it clear that, even in 2010, before he took any FMLA leave, he already demonstrated problems with technical knowledge and being results-oriented.  These were the same problems that his 2011 and 2012

---

[3] Nonetheless, as explained below, Mr. Gaydos has also produced other evidence regarding Mr. Rodriguez's criticism and possible lack of understanding of his FMLA rights, which is sufficient to allow his retaliation claim to survive summary judgment on the issue of whether Mr. Rodriguez's assessment of him for the RIF was improperly influenced by his FML leave.

performance reviews discussed, and Mr. Byrd even noted some improvement in these areas in 2012, while Mr. Gaydos was taking his intermittent FMLA leave throughout the year.

As for Mr. Gaydos's bonuses and raises, it is true that, prior to his taking FMLA leave in April 2011, he received a middling raise relative to other Sikorsky supervisors, in contrast with April 2013, when he and Ms. Burks, who eventually received identical scores to Mr. Gaydos in the RIF and was also terminated, were the only supervisors to receive a raise lower than 1.9%. Amended Compl. ¶¶ 33-34, ECF No. 11; Def.'s Ex. 13, ECF No. 39-13.  His bonuses however, remained similarly low relative to those received by other supervisors both before and after he began taking FMLA leave.  He received a $3,000 bonus in both April 2011 and April 2013, while other supervisors received $5,000 to $8,000 in 2011 and $4,000 to $5,500 in 2013. Overall, when combined with his performance issues, the incomplete bonus and salary information in the record does not raise a genuine issue of disputed material fact on whether fluctuations in Mr. Gaydos's bonuses and raises were negatively influenced by his FMLA leave.

Mr. Gaydos also attempts to compare himself to Dennis Hamilton, another supervisor in Mr. Rodriguez's chain of command who, in 2012 and 2013, received lower summary ratings than Mr. Gaydos did in 2010 and 2012.  Pl.'s Br. 21, ECF No. 49-1; Pl.'s Ex. 13, ECF No. 49-15; Pl.'s Ex. 12, ECF No. 49-14.  Mr. Hamilton received significantly higher scores than Mr. Gaydos on the RIF, with a total of 21 points.  Def.'s Ex. 12, ECF No. 39-12.  Mr. Hamilton's PFTs were written by his direct supervisor, John Amatuzzi.  Pl.'s Ex. 13, ECF No. 49-15; Pl.'s Ex. 12, ECF No. 49-14.  Mr. Hamilton received arguably similar comments as Mr. Gaydos regarding weaknesses in his job performance, including, in 2012, that he should be "more proactive rather [than] reactive" and "better understand technical issues."  Pl.'s Ex. 12; ECF No. 49-14.  If Mr. Gaydos is to show that he was treated differently from "similarly situated"

employees who did not take FMLA leave, the "individuals with whom [he] attempts to compare [himself] must be similarly situated in all material respects," including being supervised by the same supervisors. *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) ("[Plaintiff], therefore, alleges no facts to demonstrate that male employees supervised by Gregory McGraw or Jerome Johnson were treated differently."). Because Mr. Hamilton was reviewed by a different direct supervisor from Mr. Gaydos, he is not similarly situated and his PFT evaluations are not comparable to Mr. Gaydos's.

Furthermore, while Mr. Gaydos and Mr. Hamilton received comparable raises, with both receiving a 2.8% raise in 2011 and 1.5% and 1.9% in 2013 respectively, Mr. Hamilton consistently received significantly higher bonuses, with $5,400 in 2011 and $5,000 in 2013, compared to the $3,000 Mr. Gaydos received in both years. Def.'s Ex. 13, ECF No. 39-13; Amended Compl. ¶¶ 33-34, ECF No. 11; Gaydos Decl. ¶ 15, ECF No. 49-3. Mr. Hamilton's higher bonuses further support the inference that his performance was not comparable with Mr. Gaydos's and justified his higher RIF scores.

### b.    Mr. Byrd's Criticisms of Plaintiff's FMLA Leave

Mr. Gaydos also points to certain comments from his direct supervisor, Mr. Byrd, that might support an inference of discriminative intent as a true motive for negative assessments of his performance. In January 2012, Mr. Byrd once told Mr. Gaydos that the situation with his FMLA leave was "unacceptable" and that "we can't do business like this." Gaydos Dep. 66:20-67:2, ECF No. 39-3. In the spring of 2013, there was an occasion where Mr. Byrd "became very belligerent" upon hearing that Mr. Gaydos could not stay beyond his scheduled work hours, and Mr. Byrd ended the conversation by "mumbl[ing] and storming off." *Id.* at 67:2-5. Mr. Byrd also once told Mr. Gitto that there were negative business impacts from Mr. Gaydos's FMLA

absences because he sometimes missed work-related communications.  Gitto Dep.  23:10-24:4,
ECF No. 49-7.

Of course, not all comments that are potentially indicative of discriminatory animus
against Mr. Gaydos's FMLA leave are sufficient to support a rational finding that it was more
likely than not that the RIF was a pretext to fire him for taking leave.  "[S]tray remarks alone do
not support a discrimination suit," and will not allow an employment discrimination case to
survive summary judgment.  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)
(internal quotation marks omitted).  Factors that assist in determining whether stray remarks are
probative of employment discrimination include "(1) who made the remark (i.e. a decision-
maker, a supervisor or a low level co-worker), (2) when the remark was made in relation to the
employment decision at issue, (3) the content of the remark (i.e., whether a reasonable juror
could view the remark as discriminatory), and (4) the context in which the remark was made
(i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharm., Inc.*, 616
F.3d 134, 149 (2d Cir. 2010) (approving of factors district court used to decide motion to exclude
testimony).  The "more remote and oblique the remarks are in relation to the employer's adverse
action, the less they prove that the action was motivated by discrimination."  *Id.* (internal
quotation marks omitted).  Even stray remarks from a decision-maker, however, "do not
constitute sufficient evidence to make out a case of employment discrimination," without more.
*Danzer*, 151 F.3d at 56.

While Mr. Byrd's comments, on their face, are explicitly critical of Mr. Gaydos's use of
FMLA leave, these comments were far removed from the decision to terminate Mr. Gaydos.  Mr.
Byrd's comments were all made in 2012, two years before Mr. Gaydos was terminated in the
February 2014 RIF.  Furthermore, Mr. Byrd did not assess him during the RIF and played no role

in the assessment.  Byrd Dep. 97:18-23, ECF No. 39-4.  Indeed, Mr. Byrd was terminated in the same RIF.  Byrd Dep. 5:20-23, ECF No. 39-4.  Instead, Mr. Rodriguez conducted all the assessments using his own knowledge and memory of the employees.  Rodriguez Dep. 157:9-16 ECF No. 39-5.  The evidence surrounding Mr. Byrd's conduct towards Mr. Gaydos's FMLA leave cannot support a rational finding that Defendant retaliated against him for his FMLA leave because Mr. Byrd did not contribute to the decision-making during the RIF that resulted in Mr. Gaydos's termination.

Mr. Gaydos also points to a "cat's paw" theory of discrimination, presumably to link Mr. Byrd's more direct criticisms of his FMLA leave to Mr. Rodriguez's assessments of him in the RIF.  Pl.'s Memo. Of Law 44-45, ECF No. 49-1.  Courts in this district have recognized that evidence of a nondecisionmaker's discriminatory motive influencing a decisionmaker to take an adverse employment action can support a finding of discriminatory intent.  *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 179-80 (D. Conn. 2015); *Saviano v. Town of Westport*, No. 3:04-cv-522 (RNC), 2011 WL 4561184, at *7 (D. Conn. Sept. 30, 2011).  Mr. Gaydos has not, however, pointed to any evidence showing that Mr. Byrd directly influenced Mr. Rodriguez's assessments of his job performance.  While Mr. Byrd was the one who filled out the majority of Mr. Gaydos's PFTs in the record, with the exception of 2011, when both Mr. Rodriguez and Mr. Byrd contributed to the PFT, Mr. Rodriguez was the only one performing the assessments for the RIF.  Thus, even if Mr. Byrd's isolated comments from 2012 show discriminatory intent, no reasonable jury could find that Mr. Gaydos's RIF scores were pretext for retaliation on the grounds that Mr. Rodriguez was influenced by Mr. Byrd's comments when making his assessments for the February 2014 RIF.

### 3.      Mr. Gaydos' Termination

Sikorsky does not dispute Mr. Gaydos's prima facie case with regards to his termination. Instead, Sikorsky argues that he cannot establish that the February 2014 RIF and the assessment scores he received during the RIF were a pretext for retaliation, rather than a legitimate, non-retaliatory reason for his termination.  Def.'s Br. 12, ECF No. 39.  An employer's evidence demonstrating that an employee was terminated through a "business-justified, company-wide reduction in its work force," in response to changing business conditions and with reliance on "non-discriminatory guidelines in selecting the employees to be fired," effectively rebuts a prima facie case of employment discrimination. *Viola v. Philips Medical Systems of North Am.*, 42 F.3d 712, 717 (2d Cir. 1994) (finding defendant's evidence of company-wide reduction in force sufficient to rebut plaintiff's prima facie case in age discrimination case).

Sikorsky presented ample evidence establishing that the February 2014 RIF process relied on non-discriminatory guidelines and was justified by business concerns.  Mr. Gaydos was one of 250 employees that were terminated.  Ms. Burks, the only other L6 Blades Supervisor in Mr. Rodriguez's chain of command who was eliminated, received the same score as Mr. Gaydos despite not taking FMLA leave.  Sikorsky has not hired a replacement for Mr. Gaydos.  With Sikorsky having made a showing of a legitimate nondiscriminatory reason for Mr. Gaydos's termination, the remaining question is whether Mr. Gaydos can point to enough evidence that a rational jury could find that the purportedly non-discriminatory RIF was merely a pretext for retaliating against him for his use of FMLA leave.  *Graziadio*, 817 F.3d at 429.

While it is undisputed that Mr. Gaydos was a generally competent employee, the record also shows that the problems with his job performance that contributed to his low ratings in the RIF assessment which, in turn, led to his termination, were ones that recurred throughout his career at Sikorsky.  Although Mr. Gaydos's annual performance reviews and other indicators of

his job performance, such as his raises or bonuses, from after he began taking FMLA leave were largely consistent with those from the period before he began taking leave, Mr. Gaydos has produced other evidence that supports a rational finding that his RIF scores were a pretext for retaliation.  Specifically, Mr. Gaydos has produced evidence of Mr. Rodriguez's expressed disapproval of his FMLA leave, which, when combined with evidence of Mr. Rodriguez's need for Mr. Gitto's counseling regarding Mr. Gaydos's FMLA rights and of Mr. Rodriguez's participation in transferring Mr. Gaydos to the ACE coordinator position against Mr. Gitto's recommendation, establishes a triable issue of fact regarding whether Mr. Rodriguez's ostensibly neutral evaluation of Mr. Gaydos for the RIF was actually influenced by retaliatory animus against his use of FMLA leave.

As Mr. Rodriguez was the primary decisionmaker giving Mr. Gaydos his scores in the February 2014 RIF that led to his termination, evidence of Mr. Rodriguez's discriminatory intent regarding Mr. Gaydos's RIF could support a rational finding that the RIF scores were a pretext for retaliation.  In the latter half of 2013, Mr. Rodriguez once responded by stopping, taking a moment seemingly to compose himself, and shaking his head and walking off after Mr. Gaydos said he could not stay past his scheduled shift because of his FMLA leave.  Gaydos Dep. 68:21-69:10, ECF No. 39-3.  Mr. Rodriguez also testified that one of his general criticisms of Mr. Gaydos's insufficient engagement with the workplace or the "hourly process" as being an issue of his inability to "get in there every day, understand what's going on and help us to meet our business goals."  Rodriguez Dep. 53:7-9, ECF No. 49-6.  Furthermore, in the meeting where Mr. Byrd informed Mr. Gitto that Mr. Gaydos's FMLA absences were having a "business impact," Mr. Rodriguez "deferred to Mr. Byrd's opinion."  Gitto Dep. 23:21-24:8, ECF No. 49-7.  Mr. Rodriguez also contributed to the decision to transfer Mr. Gaydos to the ACE coordinator

position after receiving Mr. Gitto's explicit advice not to do so because it would not be a "substantially equivalent position." *Id.* at 35:21-24.

While Mr. Rodriguez never directly criticized Mr. Gaydos for taking FMLA leave, there are facts surrounding his conduct that create a triable issue of fact over whether Mr. Rodriguez's ostensibly neutral assessments of Mr. Gaydos's performance for the RIF were pretextual and motivated by Mr. Gaydos's FMLA leave.  In one instance, Mr. Rodriguez was silent, shook his head, and walked off after hearing that Mr. Gaydos could not work late.  While this reaction was arguably ambiguous due to Mr. Rodriguez's silence, it could also support an inference that Mr. Rodriguez was unhappy with Mr. Gaydos's FMLA leave, even if this encounter occurred in 2013, the year before the RIF.  As for Mr. Rodriguez's testimony that Mr. Gaydos was failing to demonstrate sufficient engagement with "hourly process" by "being able to get in there every day, understand what's going on, and help us to meet our business goals," even if the record demonstrates that Mr. Gaydos had similar problems with being insufficiently goal-oriented in 2010 before taking FMLA leave, Mr. Rodriguez's comment about "being able to get in there every day" could also be interpreted as a criticism of Mr. Gaydos's FMLA absences.  The dispute over whether Mr. Rodriguez's comments are sufficient to show that Mr. Gaydos's RIF score was pretextual is one that is appropriately resolved by the jury, particularly since the record also indicates that Mr. Rodriguez had to be counseled more than once by Mr. Gitto regarding how to treat Mr. Gaydos during his FMLA leave.

Summary judgment is therefore denied on this narrow question underlying Mr. Gaydos's retaliation claim:  whether Mr. Rodriguez's conduct showed that his assessments of Mr. Gaydos for the RIF were pretext for retaliation.  As discussed above, summary judgment is granted, however, on the two other theories of recovery under Mr. Gaydos' FMLA retaliation claim: his

temporary transfer to a non-supervisory position and his alleged differential and adverse treatment vis-à-vis other employees not on FMLA leave prior to his termination.

### B.    Count Two: Interference Claims

"[T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424 (adopting standard for FMLA interference claims).  The rights protected by the FMLA include "the right to take leave, receive benefits during leave and be restored to the same or equivalent position following leave." *DeAngelo*, 105 F. Supp. 3d at 182 (internal quotation marks omitted).  With FMLA interference claims, the "employer's subjective intent is not an issue," and the question is simply whether the employer provided the employee with the rights protected by the FMLA.  *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014).

In FMLA interference cases based on an employee's termination, the plaintiff  "need only prove by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [him]" using either direct or circumstantial evidence, and "[n]o scheme shifting the burden of production back and forth is required."  *Sista*, 445 F.3d at 175-76 (quoting *Potenza*, 365 F.3d at 167-68); *see also DeAngelo*, 105 F. Supp. 3d at 183 (denying motion for summary judgment on FMLA interference claim where a reasonable jury could find that plaintiff's request for FMLA leave was a negative factor contributing to his termination).  An employer is not, however, liable for "'interfering' with an employee's leave when the employee would have been terminated regardless of the leave."  *Pearson v. Unification*

*Theological Seminary*, 785 F.Supp.2d 141, 162 (S.D.N.Y. 2011).  In other words, the "FMLA is

not a shield to protect employees from legitimate disciplinary action by their employers if their

performance is lacking in some manner unrelated to their FMLA leave."  *Geromanos v.*

*Columbia Univ.*, 322 F.Supp.2d 420, 429 (S.D.N.Y. 2004).

Defendant does not contest the first four prongs of the prima facie case, but argues that

Mr. Gaydos was never denied any benefits to which he was entitled under the FMLA.  Mr.

Gaydos concedes that Sikorsky gave him all of the FMLA leave that he requested from when he

first applied for FMLA leave in October 2011 through his termination in February 2014.  Def.'s

Local Rule 56(a)(1) Statement ¶¶ 14-17, ECF No. 40; Pl.'s Local Rule 56(a)(2) Statement ¶¶ 14-

17, ECF No. 49-2.  Throughout this period, he continued to work as a supervisor at Sikorsky

while taking intermittent FMLA leave for an average of two days per week.  Def.'s Local Rule

56(a)(1) Statement ¶ 18.  While Sikorksy gave Mr. Gaydos all of the FMLA leave that he

requested, there is a triable issue of fact as to whether Mr. Gaydos' FMLA leave was a "negative

factor" in Mr. Rodriguez's assessment of him during the RIF and therefore a negative factor in

Defendant's decision to terminate Mr. Rodriguez.

As discussed above, the record supports a reasonable finding that most of the negative

assessments of Mr. Gaydos's job performance and his relatively low bonuses and raises were

unrelated to his FMLA leave because these indicators of his job performance were largely

consistent between both the periods before and after he took FMLA leave.  With respect to Mr.

Gaydos's termination, however, there remains a question of whether Mr. Rodriguez was

influenced by discriminatory animus regarding Mr. Gaydos's exercise of his FMLA rights and

whether that animus affected the scores that Mr. Rodriguez gave Mr. Gaydos during the RIF.

Because the record establishes that Mr. Rodriguez was the sole decisionmaker giving Mr.

Gaydos his RIF scores before the scores were reviewed by Mr. Walling and Mr. Palumbo, evidence that supports a finding that Mr. Rodriguez had discriminatory intent towards Mr. Gaydos's FMLA leave also supports a finding that Mr. Gaydos's termination was negatively influenced by his use of his FMLA rights.  Mr. Gaydos's interference claim therefore survives summary judgment with regards to the question of Mr. Rodriguez's possible discriminatory intent.

For the reasons discussed above with respect to the retaliation claim, Mr. Rodriguez's conduct raises a triable issue of fact.  The same facts, surrounding whether Mr. Rodriguez's earlier expressions of disdain for Mr. Gaydos' FMLA leave and his need for counseling by Mr. Gitto regarding the need to treat Mr. Gaydos fairly while he was taking FMLA leave, provide a basis for a viable FMLA interference claim in addition to the retaliation claim.  These facts permit a jury to infer that Mr. Gaydos's exercise of his FMLA rights may have been a "negative factor" in the decision to terminate him.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion for summary judgment on both Count One and Count Two, solely on the narrow issue of whether Mr. Rodriguez's assessment of Mr. Gaydos during the RIF was pretext for discrimination and a negative factor in his termination in violation of the FMLA's retaliation and interference provisions, respectively.  The Court **GRANTS** Defendant's motion for summary judgment on the issues of whether Sikorksy retaliated against Mr. Gaydos for exercising his FMLA rights by transferring him to a non-supervisory position or by treating him adversely and differently from other similarly situated employees with respect to performance evaluations, the awarding of bonuses and raises, or in any other way before his termination.

32

SO ORDERED at Bridgeport, Connecticut, this 31st day of August, 2016.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge